UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————x

DWAYNE C. SAMUEL,

                Plaintiff,

    v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

————————————————————x

**<u>MEMORANDUM & ORDER</u>**

14 CV 4634 (PKC)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Dwayne C. Samuel ("Samuel" or "Plaintiff") commenced this action under 42 U.S.C. § 1383(c)(3), seeking judicial review of a final decision of the Defendant Commissioner of Social Security (the "Commissioner"), finding that Samuel was ineligible for Supplemental Security Income ("SSI") benefits. (Dkt. 1.) The Commissioner moves for judgment on the pleadings, affirming her decision. (Dkt. 17.) Samuel, who was unrepresented in the administrative proceedings and has obtained counsel after filing this action, cross−moves for judgment on the pleadings, reversing the Commissioner's decision and remanding for a new hearing and decision on the grounds that the administrative law judge ("ALJ") did not properly advise him of his right to counsel at the hearing, and that the absence of counsel prejudiced Plaintiff. (Dkt. 19.) For the reasons set forth below, the Court GRANTS Samuel's cross−motion, and DENIES the Commissioner's motion.

## *BACKGROUND*

### I.     The Administrative Record

As Samuel seeks remand based on a limited procedural issue, the sets forth only those portions of the administrative record that are relevant to the resolution of that issue.  The Court otherwise presumes the parties' familiarity with the record.

Samuel was born on March 26, 1991.  (Tr. 129, 668.)[1]  He left school before completing 12th grade.  (Tr. 669−70.)  He has never worked.  (Tr. 674.)

On March 12, 2003, when Samuel was in the seventh grade, an intelligence test administered by a school psychologist revealed that Samuel had a verbal IQ of 89, a performance IQ of 64, and a full scale score of 75.  (Tr. 237−39.)  Samuel, who had already been attending special education classes, was to be placed in a small, highly structured classroom setting.  (Tr. 237−38.)  An Independent Education Plan ("IEP") was completed for Samuel in August 2004. (Tr. 241−54.)  In September 2004, Samuel began attending PS 369, where he was in a 12:1:1 classroom, and received counselling and speech/language therapy.  (Tr. 240−41, 251.)

On March 1, 2005, Samuel was consultatively examined by E. Hoffman, Ph.D., who tested his IQ.  (Tr. 324−26.)  At that time, Samuel was seeing a psychiatrist every two weeks and had previously been taking Ritalin.  (Tr. 324.)  Samuel had a verbal IQ of 63, a performance IQ of 83, and a full scale IQ of 71.  (Tr. 325.)  Dr. Hoffman diagnosed Samuel with learning problems, by history, and mild mental retardation.  (Tr. 326.)  He concluded that Samuel was functioning within the mentally deficient range in the verbal domain, and overall functioning within the borderline range of intelligence.  (*Id.*)

---

[1] "Tr." refers to pages in the certified administrative record.  (Dkt. 8.)

Meryam Sheriaty, M.D., performed a psychiatric evaluation of Samuel on April 22, 2005 at Interfaith Medical Center Behavioral Health Child and Adolescent Clinic ("Interfaith"). (Tr. 340−43.) Samuel's memory and attention/concentration were fair. (Tr. 341.) His intellectual functioning was fair to below average. His attitude and behavior were appropriate, and his mood was slightly dysphoric.[2] His thought process and content were goal directed. (*Id.*) His insight and judgment were fair. (Tr. 342.) Dr. Sheriaty diagnosed attention deficit and hyperactivity disorder ("ADHD"), dysthymic disorder, and borderline intelligence. (*Id.*) She assigned a Global Assessment of Functioning ("GAF")[3] score of 55. (Tr. 343.)

On December 8, 2006, Samuel underwent a psychiatric examination by Gadalla Mason, of Interfaith. (Tr. 318−21.) Samuel's memory, attention/concentration, and intellectual functioning were fair. (Tr. 319.) His attitude was friendly, and his mood was slightly dysphoric(*Id.*) His insight and judgment were fair. (Tr. 320.) Samuel was diagnosed with a dysthymic disorder.[4] (*Id.*)

On April 20, 2009, a school psychologist completed a questionnaire concerning Samuel's abilities in the six domains of childhood functioning. (Tr. 369−76.) Samuel had been attending PS 35M Manhattan High School for four years. (Tr. 369.) He was in the tenth grade in a 12:1:1

---

[2] Dysphoria is a mood of general dissatisfaction, restlessness, depression, and anxiety. *Stedman's Medical Dictionary* ("*Stedman's*"), available at Westlaw STEDMANS 273670.

[3] A GAF between 41 and 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. A GAF between 51 and 60 indicates moderate symptoms (*e.g.*, flat effect, circumstantial speech, and occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co−workers). *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th edition−text revision 2000) ("DSM–IV–TR") at 34.

[4] Dysthymic disorder refers to a chronic disturbance of mood characterized by mild depression or loss of interest in usual activities. *Stedman's* 259940.

classroom, and had been receiving counseling from the psychologist twice per week. Samuel's reading level was grade level 3−4, and he had been absent for 51 out of 132 days. (*Id.*)

The psychologist opined that Samuel had several problems in the domain of acquiring and using information. (Tr. 370.) Samuel had obvious problems in comprehending oral instructions, understanding school and content vocabulary, comprehending and doing math problems, understanding and participating in class discussions, and learning new material. He had serious problems in reading and comprehending written material, recalling and applying previously learned material, and applying problem−solving skills in class discussions. He had very serious problems in providing organized oral explanations and adequate descriptions, and expressing ideas in written form. (*Id.*)

The psychologist also assessed that Samuel had problems in attending and completing tasks. (Tr. 371.) Samuel had slight problems in paying attention when spoken to directly and carrying out multi−step instructions. He had obvious problems in sustaining attention during play/sports activities, focusing long enough to finish an assigned activity or task, refocusing to task when necessary, and changing from one activity to another without being disruptive. Samuel had serious problems in carrying out single−step instructions, organizing his things or school materials, working without distracting self or others, and working at reasonable pace/finishing on time. He had very serious problems with completing class/homework assignments and completing work accurately without careless mistakes. These problems presented on a daily basis. (*Id.*) The psychologist opined that Samuel had no problems in the domains of "interacting and relating with others," "moving about and manipulating objects," and "caring for himself." (Tr. 372−74.)

On April 21, 2009, Samuel was consultatively examined by Heidi Van Horne, Psy. D. (Tr. 377−80.) Samuel was 18 and in special education classes. (Tr. 377.) He was able to dress, bathe and groom himself, but did not cook, clean, do laundry, or manage his money. (Tr. 379.) He had friends and maintained family relationships. He took public transportation independently. He spent time at home playing video games, reading, and occasionally doing his homework. (*Id.*) Samuel reported that between 2004 and 2007, he had seen a therapist and a psychiatrist, who had prescribed Strattera for ADHD. (Tr. 377.) Samuel was not in treatment at the time of the exam. He had been hospitalized in November 2007 for a stab wound which was not self-inflicted. He had asthma, and was taking Albuterol and using a nebulizer. Samuel reported that he had recently lost his appetite and generally felt "down and terrible." (*Id.*) He had used marijuana since the age of 14, and most recently, two weeks before the exam. (Tr. 378.) He had been arrested three times for robbery, drug possession, and assault, and was currently on interim probation. (*Id.*)

On examination, Dr. Van Horne found that Samuel was cooperative and related adequately. (*Id.*) His thought processes were coherent and goal directed. His affect was full ranged, and his speech and thought content were appropriate, although somewhat restricted. His mood was neutral, and his sensorium was clear. (*Id.*) His attention, concentration, and memory were intact. (Tr. 378−79.) He was able to perform simple calculations and serial threes. (Tr. 378.) Samuel was able to recall three out of three objects immediately and two after five minutes. (Tr. 379.) He could state five digits forwards and three backwards. (*Id.*)

Cognitively, Samuel appeared to be below average. (*Id.*) His general fund of information appeared to be appropriate to experience. Samuel's insight and judgment were fair. (*Id.*) Dr. Van Horne diagnosed Samuel with a learning disorder not otherwise specified ("NOS"), but

ruled out ADHD combined type. She also diagnosed cannabis abuse. (Tr. 379−80.) She recommended individual psychotherapy and vocational training. (Tr. 380.) Dr. Van Horne opined that Samuel was able to follow and understand simple directions and instructions, and perform simple tasks independently. (Tr. 379.) He could maintain attention and concentration, and a regular schedule. He was able to learn new tasks, but might find complex tasks challenging. He might have some trouble making appropriate decisions. He seemed able to relate adequately with others and deal with stress. (*Id.*)

On March 25, 2010, Samuel was consultatively examined by John Laurence Miller, Ph.D. (Tr. 390−93.) Samuel stated that he had traveled to the appointment independently. (Tr. 390.) Samuel tended to his personal needs, cooked, cleaned, did laundry, shopped, managed money, and took public transportation. (Tr. 392.) He had a few friends and great family relationships. He reported that he spent his days going to the movies, having dinner out, playing sports (basketball, football, and baseball), and seeing friends. (*Id.*) He said that he had completed the eleventh grade in special education classes and was still in school. (Tr. 390.) Samuel also reported that he had received psychiatric outpatient treatment at Interfaith with "Dr. Butts" and "Dr. Anderson." His only medication was Albuterol for asthma. Samuel had used marijuana from 2000 to 2009, and participated in a drug treatment program in 2007. He denied current drug use. He had been arrested in 2007, served six months in jail, and was currently on probation. (Tr. 391.) Samuel reported the following issues: difficulty sleeping; dysphoric mood, psychomotor retardation, irritability; muscle tension; difficulty learning new material; difficulty abstracting; and long term memory deficits. (Tr. 390−91.)

On mental status examination, Samuel's dress and grooming were appropriate. (Tr. 391.) His eye contact was appropriate, his speech was fluent, and his expressive and receptive

language skills were adequate.  His thought processes appeared coherent and goal directed.  He appeared suspicious, and had poor social skills.  (*Id.*)  His mood was dysthymic, and his affect was dysphoric.  Samuel's attention and concentration were intact; he was able to perform simple calculations and serial threes.  His recent and remote memory skills were intact; he recalled three out of three objects immediately and after five minutes, and six digits forwards and three backwards.  (*Id.*)  His intellectual functioning appeared to be average to below average, and fund of information was somewhat limited.  (*Id.*)  His insight was poor, and his judgment was fair. (Tr. 392.)  Dr. Miller diagnosed cannabis dependence/abuse. He opined that, depending upon the task, Samuel might have some trouble learning new tasks and performing complex tasks independently.  Due to his youth, Samuel might have trouble making appropriate decisions.  Dr. Miller also opined that Samuel's "difficulties are caused by cognitive deficits."  (*Id.*)  Dr. Miller stated that otherwise, Samuel should be able to perform all vocational capacities.  He could manage his own funds.  He had substance abuse problems, but these did not appear significant enough to interfere with his ability to function on a daily basis.  (*Id.*)

On July 9, 2010, Samuel was re-examined by Dr. Van Horne, who administered intelligence testing.  (Tr. 408−11.)  Samuel stated that he was living with his aunt and attending summer school, and that he planned to graduate after its completion.  (Tr. 408.)  He denied any drug or alcohol history.  (*Id.*)  Samuel said he cooked, did laundry, managed money, and travelled independently.  (Tr. 410.)  He did not have many friends, but spent time with his aunt. He watched television and read.  (*Id.*)

IQ testing revealed a verbal comprehension index of 70, a perceptual reasoning index of 65, a working memory index of 77, a processing speed index of 68, and a full scale score of 64. (Tr. 409.)  Dr. Van Horne noted that Samuel's full scale score placed him in the mildly retarded

range, but he had demonstrated some unevenness across the various areas tested. He had worked deliberately and with reflection during the testing. On mental status examination, Samuel's dress was appropriate, his hygiene was good, and his eye contact was appropriate. His speech and language skills were adequate. He seemed to recall and understand instructions. His attention and concentration were age appropriate. (*Id.*)

Dr. Van Horne diagnosed learning disorder NOS, rule out ADHD NOS, and mild mental retardation. (Tr. 410.) She opined that Samuel could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, learn new tasks, perform some complex tasks independently, make appropriate decisions, and relate adequately with others. He might have some difficulty dealing with stress, and might benefit from assistance in managing his funds. (*Id.*)

On September 1, 2010, J. Echevarria, M.D., a state agency psychiatric consultant, reviewed the evidence pertaining to Samuel's mental impairments, including his IQ scores that were in the 60−70 range, and opined that Samuel did not have a major impairment with respect to labor type work. (Tr. 425−28.) On October 14, 2010, Dr. Echevarria completed a mental residual functional capacity ("RFC") assessment (Tr. 438−41) and a psychiatric review technique. (Tr. 442−55.) Dr. Echevarria assessed Samuel as not being significantly limited in multiple abilities, including being able to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; make simple work-related decisions; ask simple questions or request assistance; and travel in unfamiliar places or use public transportation. (Tr. 438−39.) Samuel was moderately limited in his ability understand, remember and carry out detailed instructions, complete a normal workday and workweek without interruptions from

psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)  Dr. Echevarria opined that Samuel had a mild restriction in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; and experienced one or two episodes of deterioration, each of extended duration.  (Tr. 452.)

## II.    <u>Procedural History</u>

Samuel, through his legal guardian and aunt Victoria Soto ("Soto"), initially filed an application for SSI on December 10, 2004, when he was 13 years old.  (Tr. 129−38; *see* Tr. 185−93.)  In a decision dated June 30, 2006 (Tr. 688−93), ALJ Harvey Feldmeier issued a fully favorable decision on Samuel's SSI application.  (Tr. 688.)  The ALJ declined to schedule a hearing, determining instead that the evidence in the record was sufficient to establish disability based on the severe impairments of "mental retardation" and "behavioral disorder of childhood." (Tr. 691−92.)  In particular, Samuel had a verbal IQ score of 63 and another mental impairment (a behavioral disorder), which imposed additional and significant limitations in his ability to function, specifically, in his ability to interact and relate with others.  (Tr. 691.)  ALJ Feldmeier thus concluded that Samuel's impairments met the criteria of 112.05D of Appendix 1, Subpart P, of Regulation No.4.  (*Id.*)  Samuel received SSI based on developmental disabilities until he turned 18.  (Tr. 23.)

As required by the Social Security Act ("the Act"), the Social Security Administration ("SSA") reviewed Samuel's case when he turned 18 to determine whether he continued to be disabled under the SSI standards for disability pertaining to adults.  *See* 42 U.S.C. § 1382c(a)(3)(H)(iii); 20 C.F.R. § 416.987.  In a decision dated April 20, 2010, the SSA informed

Samuel that based upon the adult SSI standards, he was no longer disabled or eligible for SSI. (Tr. 40−43.)

On May 11, 2010, Samuel, through his aunt, filed a request for reconsideration. (Tr. 44−46.) On February 3, 2011, a hearing was held before Disability Hearing Officer ("DHO") R. Gorelick. (Tr. 66.) Samuel and his aunt were present, and provided testimony, at the hearing. (Tr. 47.) Samuel testified that his impairments were asthma, ADHD, and an "emotional problem." (Tr. 49.) Samuel's aunt testified that he suffered from "mental problems" and described his poor academic performance. (Tr. 68.)

In a decision dated February 21, 2011, the DHO found that Samuel's disability as a child had ceased as of April 13, 2010. (Tr. 66−75.) The DHO determined that Samuel had two severe impairments−asthma and an emotional problem−that significantly affected the type of work he was able to perform. (Tr 70, 72.) However, the DHO determined that based on the available evidence and Samuel's testimony regarding his ability to perform his activities of daily living, Samuel could still perform some jobs in the national economy and therefore was not disabled. (Tr. 70−71.)

Samuel's aunt filed a request for a hearing before an ALJ on April 6, 2011. (Tr. 77−79.) On June 28, 2012, a hearing was held before ALJ Valorie Stefanelli. (Tr. 23, 661−87.) Soto accompanied Samuel to the hearing, but was not permitted to enter the hearing room with him. (*See* Dkt. 19 Ex. A ("Soto Aff.") ¶ 6.) At the hearing, the ALJ asked Samuel whether Samuel was aware of his right to a representative and whether he wanted to proceed with representation. The ALJ then obtained Samuel's signature on a waiver of representation form. (Tr. 120, 664−65.)

Following the hearing, on July 2, 2012, the ALJ requested additional records from Beth Israel Medical Center ("Beth Israel") and Interfaith. (Tr. 32, 33.)

In a decision dated August 21, 2012, ALJ Stefanelli found that Samuel's child SSI benefits were correctly ceased as of April 2010, and he was not disabled under the adult disability standards through the date of the ALJ's decision. (Tr. 20−31.)

ALJ Stefanelli's decision became the final decision of the Commissioner on June 3, 2014, when the Appeals Council denied Samuel's request for review. (Tr. 6−9.) This action followed. After the filing, Samuel obtained counsel.

## *STANDARD OF REVIEW*

### I.    <u>District Court Review of Administrative Decisions</u>

In reviewing a final decision of the Commissioner, the Court's duty is to determine whether it is based upon correct legal standards and principles and whether it is supported by substantial evidence in the record, taken as a whole. *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (the Court "is limited to determining whether the [SSA's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard"). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (alterations and internal quotation marks omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983). However, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the

record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013).

Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, the Court "must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the . . . Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). "The Act must be liberally applied, for it is a remedial statute intended to include not exclude." *Cruz*, 912 F.2d at 11.

## II.     Eligibility Standard for Social Security Disability

The Act provides that an individual is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3). To qualify for benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D); *accord Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999).

The Act's regulations prescribe a five–step analysis for the Commissioner to follow in determining whether a disability benefit claimant is disabled within the meaning of the Act. First, the Commissioner determines whether the claimant currently is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(3)(i). If not, the Commissioner proceeds to the second inquiry, which is whether the claimant suffers from a

medical impairment, or combination of impairments, that is "severe," meaning that the impairment "significantly limits [claimant's] physical or mental ability to do basic work activities." If the impairment is not severe, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(ii).

If the impairment is severe, the Commissioner proceeds to the third inquiry, which is whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Act's regulations (the "Listings"). If so, the claimant is presumed disabled and entitled to benefits. 20 C.F.R. § 416.920(a)(4)(iii).

If not, the Commissioner proceeds to the fourth inquiry, which is whether, despite claimant's severe impairment, he has the "residual functional capacity" ("RFC") to perform past work. 20 C.F.R. § 416.920(a)(4)(iv). In determining a claimant's RFC, the Commissioner considers all medically determinable impairments, even those that are not "severe." 20 C.F.R. § 416.954(a). If the claimant's RFC is such that he or she can still perform past work, the claimant is not disabled.

If the claimant cannot perform past work, the Commissioner proceeds to the fifth and final inquiry, which is whether, in light of the claimant's RFC, age, education, and work experience, the claimant has the capacity to perform other substantial gainful work which exists in the national economy. 20 C.F.R. § 416.920(a)(4)(v). If the claimant has such capacity, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

The claimant bears the burden of proving his or her case at steps one through four; at step five, the burden shifts to the Commissioner to establish that there is substantial gainful work in the national economy that the claimant could perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

## III.    "Special Technique" for Evaluation of Mental Impairments

Evaluation of mental impairments follows a "special technique" pursuant to 20 C.F.R. § 416.920a(a).  *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) ("Th[e] regulations require application of a 'special technique' at the second and third steps of the five−step framework [ ] and at each level of administrative review.") (internal citation omitted). This technique requires "the reviewing authority to determine first whether the claimant has a medically determinable mental impairment, [and if] there is such impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph C of the regulations, which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Hernandez v. Astrue,* 814 F.Supp.2d 168, 180–81 (E.D.N.Y. 2011) (citations omitted); *see* 20 C.F.R. § 416.920a(b), (c). "[I]f the degree of limitation in each of the first three areas is rated mild or better, and no episodes of decompensation are identified . . . , then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits."  *Kohler*, 546 F.3d at 266.

If the ALJ determines that the claimant's mental impairment or combination of impairments is severe, "in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder," the ALJ must "first compare the relevant medical findings [along with] the functional limitation ratings to the criteria of listed mental disorders." *Id.*; *see* 20 C.F.R. § 404.920a(d)(2).  If an impairment or combination of impairments meets or medically equals the severity of one of the listed mental disorders, "the claimant will be found to be disabled."  *Id.*  If not, the reviewing authority will then assess the claimant's RFC.  *Id.*; *see* 20 C.F.R. § 404.920a(d)(3).  The application of this technique shall be documented in the decision

"[a]t the initial and reconsideration levels of administrative review." *Id.*; *see* 20 C.F.R. § 404.920a(e).

## *DISCUSSION*

### I. The ALJ's Decision

In her written decision, ALJ Stefanelli found that after April 13, 2010, Samuel's learning disorder/borderline intellectual functioning was a severe impairment, but that he did not have an impairment or combination of impairments that met or equaled the criteria of the Listings for individuals age 18 and over. (Tr. 25−26.)[5] Specifically, the ALJ determined that Samuel did not meet the listing for 12.05: Intellectual Disability. (Tr. 26.) While noting that Samuel had IQ scores in the 60−70 range, the ALJ found that Samuel did not meet the criteria for Paragraphs A, B, or C because he lacked any other physical or mental impairment imposing an additional and significant work−related limitation of function. (*Id.*) The ALJ also found that the criteria in Paragraph D were not met because Samuel had no restriction in his activities of daily living or social functioning, no episodes of decompensation, and only moderate difficulties in concentration, persistence, and pace. (Tr. 26−27.)

Next, the ALJ found that Samuel retained the RFC to perform work at all exertional levels that did not require him to understand, remember, and carry out more than simple instructions. (Tr. 27−30.) According to the ALJ, Samuel's nonexertional limitations had little to no effect on the occupational base of unskilled work. (Tr. 30.)

Since Samuel had no past relevant work, the ALJ proceeded to the fifth step. (*Id.*) At step five, the ALJ relied upon Medical−Vocational Rule 204.00, which corresponds with solely

---

[5] The ALJ found that Samuel's asthma was nonsevere and imposed only a slight limitation on Samuel's ability to perform basic work activities. (Tr. 25.)

nonexertional limitations, and concluded that Samuel was not disabled under the adult standards as of April 13, 2010. (*Id.*)

The ALJ also expressed doubts about Samuel's credibility, citing inconsistencies in his testimony regarding marijuana use and his ability to use public transportation on his own. (Tr. 29.) She also noted that Dwayne was "a very poor historian" at the hearing, but a good historian in all of his consultative evaluations. The ALJ concluded that "due to the inconsistencies in the claimant's statements, the claimant's testimony regarding the severity of his impairments cannot be considered fully credible." (*Id.*)

## II.  **Analysis**

Samuel contends that the ALJ committed reversible error by providing him inadequate notice at the hearing of his right to counsel, and by failing to adequately develop the record. (Dkt. 20 at 1.)[6] The Commissioner responds that the ALJ fulfilled her duty to ensure that Samuel was aware of his statutory right to counsel, that Samuel knowingly waived that right, and Samuel cannot demonstrate any prejudice because the ALJ conducted a diligent inquiry and fully developed the record. (Dkt. 21.)

Based on a review of the administrative record, the Court concludes that this case should be remanded to permit Samuel the opportunity to proceed with counsel and allow the ALJ to more fully develop the record. While the ALJ may well reach the same conclusion after remand, the Court is persuaded that Samuel—whom the ALJ found to have severe impairments based on learning disorder/borderline intellectual functioning—was unable to fully appreciate the implications of his waiver of counsel, and was prejudiced by the absence of counsel. Bearing in mind the "beneficent purposes" of the Act, *see Moran*, 569 F.3d at 112 (quoting *Cruz*, 912 F.2d

---

[6] Docket citations refer to internal pagination rather than those assigned by the ECF system.

at 11)), the Court remands the case to permit Samuel a full and fair opportunity to present his case with the assistance of counsel.

### A. The ALJ Failed to Advise Plaintiff of His Right to Counsel at Hearing

"Although a claimant does not have a constitutional right to counsel at a social security disability hearing, [he] does have a statutory and regulatory right to be represented should [he] choose to obtain counsel." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 406 and 20 C.F.R. § 404.1705). In this regard, the applicable statute and regulations state that the Commissioner notify the claimant "in writing . . . of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner" and "also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge." 42 U.S.C. § 406(c). Further, "at the hearing itself, 'the ALJ must ensure that the claimant is aware of [his] right to counsel.'" *Lamay*, 562 F.3d at 507 (quoting *Robinson v. Sec'y of Health & Human Servs.*, 733 F.2d 255, 257 (2d Cir. 1984)) (internal brackets omitted).

There appears to be no dispute that Samuel received written notification of his right to retain a representative that satisfied the statutory requirement for written notice. The SSA twice sent Samuel, through his aunt, notices of hearing dated February 15 and May 9, 2015. (Tr. 81−88, 101−08.) In the notices, the SSA advised Samuel as follows:

> **You May Choose to Have a Person Represent You**
> If you want to have a representative, please find one right away. If you get a representative, you should show this notice to that person. You or that person should call or write this office to give us his or her name, address, and telephone number.

(Tr. 83, 102).  The notices each included a leaflet entitled "Your Right to Representation" informing Samuel, *inter alia*, that he "can have a representative, such as an attorney" assist him in his dealings with the SSA.  (Tr. 87−88, 107−08.)[7]

Samuel asserts, however, that the ALJ failed to fulfill her duty at the hearing to ensure that Samuel was aware of his right to counsel.  (Dkt. 20 at 17−20.)  According to an affidavit filed by Samuel's aunt as part of this appeal, she and Samuel traveled to the hearing together, and although they requested that Samuel's aunt accompany him into the hearing room, the hearing assistant did not permit Samuel's aunt to enter the hearing room or provide testimony. (*See* Soto Aff. ¶ 6.)  Samuel went into the hearing room alone, and eventually agreed to proceed without representation.  (Tr. 120, 664−65.)  At the start of the hearing, the following colloquy took place:

> ALJ:   . . . I will render an independent decision based upon the records that are in this file and the testimony that I hear today, okay? Now you are here without representation, sir?
>
> SAMUEL: Yeah.
>
> ALJ: You wish to proceed today without representation?
>
> SAMUEL: Yes.
>
> ALJ: Okay. You're aware that you have a right to a representative?
>
> SAMUEL: Yes.
>
> ALJ: Okay.  But you wish to proceed without one, is that correct?
>
> SAMUEL: Yes.

---

[7] Thereafter, the SSA sent Samuel, through his aunt, a reminder notice of hearing, dated June 5, 2012.  (Tr. 118−19.)  However, this notice did not include any information regarding the right to representation.

ALJ: Mr. Mays [the hearing reporter], if you could please provide Mr. Samuel with his waiver of right to representation.  You're going to waive your right to have a representative and then we can go forward today without one − −

SAMUEL: All right.

ALJ: ⸺ okay?

SAMUEL: Do I have to sign again on the bottom?

ALJ: You have to sign where it says signature.

SAMUEL: Just that, right?

(Tr. 664−65.)

In the Court's view, this colloquy was inadequate to satisfy the ALJ's duty to ensure that Samuel was sufficiently informed of his right to an attorney, and that he knowingly waived his right to representation.  Significantly, "[t]he case law does not require an ALJ to inform a claimant of the right to be *represented* at a hearing, but instead to the right to be *represented 'by counsel*.'" *Hynes v. Astrue*, 12 CV 719, 2013 WL 3244825, at *13 (E.D.N.Y. June 26, 2013) (quoting *Robinson*, 733 F.2d at 257) (emphasis added).  Thus, several courts have found that advising a claimant of the right to a representative or representation, without making clear that the right was for representation was a lawyer, was insufficient to ensure that the claimant was aware of the right to proceed with counsel.  *See, e.g.*, *Sheerinzada v. Colvin*, 4 F. Supp. 3d 481, 495−96 (E.D.N.Y. 2014) (ALJ's statement that claimant was advised of her right to representation was insufficient to ensure claimant was aware of right to proceed at hearing was counsel); *Hynes*, 2013 WL 3244925, at *13 (ALJ failed to satisfy duty even where claimant was represented by a spouse at the hearing, because the ALJ never mentioned that claimant had a right to legal counsel); *Holliday v. Astrue*, 05 CV 1826, 2009 WL 1292707, at *10–11 (E.D.N.Y. May 5, 2009) (ALJ's reference to claimant's right to a representative was insufficient, since ALJ

failed to confirm that claimant understood that the ALJ was referring to legal counsel); *see also Collado v. Astrue*, 05 CV 3337, 2009 WL 2778664, at *11−12 (S.D.N.Y. Aug. 31, 2009) (ALJ's acceptance of claimant's statement "that she would like to go on as a waiver of her right to representation," without further inquiry, was insufficient to satisfy the ALJ's duty) (internal brackets omitted).

The ALJ in this case therefore committed legal error by failing to verbally inform Samuel of his right to counsel. She did not, for instance, ask Samuel if he understood what she meant by representation, or by the word waiver. *See Holliday*, 2009 WL 1292707, at *11 (ALJ failed to provide adequate notice of right to counsel where ALJ "made no effort to confirm that [the claimant] *actually* understood" the ALJ's reference to a representative) (emphasis added). Contrary to the Commissioner's contention, the ALJ did not satisfy her duty to verbally advise Samuel and ensure his understanding by having Samuel sign a written waiver, especially since there is no evidence that Samuel read or understood the waiver language.[8] There is no indication that the ALJ read the waiver form to Samuel, gave him time to read it, or asked him if he had

---

[8] The "Waiver of Right to Representation" form signed by Samuel at the hearing stated:

> I have been advised, and I understand, that I have the right to be represented in this proceeding by an attorney or by any other qualified person of my choice.
>
> I have received a representative referral list and have been offered the opportunity to defer a decision in my appeal until I have a chance to contact sources on that list or other source of representation that I might identify on my own.
>
> I have considered the matter and have decided to waive my right to representation, and wish to proceed without a representative, OR I have attempted to obtain representation and have been unable to do so. I believe that further efforts on my part will not result in my being able to obtain a representative, so I choose to proceed without representation at this time.

(Tr. 120, 665.) Despite this language, there is no indication that the ALJ inquired if Samuel received a referral list or offered Samuel a postponement to allow him to secure counsel. (*See* Tr. 664−65.)

read it or had any questions about it. In short, the ALJ failed to make reasonable efforts to confirm that Samuel understood what the waiver of representation form meant before he signed it.

The ALJ's failure was exacerbated by Samuel's documented learning disorder and borderline intellectual functioning. Indeed, the ALJ found that these impairments qualified as severe.[9] This conclusion finds support in the medical evidence, which indicates that Samuel had intellectual deficiencies, difficulty comprehending complex concepts, and was limited in his verbal capacity. For instance, in July 2010, Samuel's full scale IQ score was 64, which placed him in the mildly mentally retarded range of cognitive functioning. (Tr. 409.) The consultative examiner who administered this exam diagnosed Samuel with mild mental retardation. (Tr. 410.) Before leaving school in the 12th grade, Samuel was in special education classes and received accommodations, such as additional time to complete tests and having directions and questions read and re−read aloud. (Tr. 240, 250−51.) When Samuel was in the tenth grade, he was estimated to be reading between the third and fourth grade reading level. (Tr. 369.) Upon an evaluation of Samuel's abilities on a scale of 1 to 5, with 5 being "a very serious problem," Samuel's functioning was rated a 5 due to Samuel's inability to provide organized oral explanations and adequate descriptions. (Tr. 369−70.)

---

[9] The possibility that the medical evidence may support a conclusion that despite Samuel's severe mental impairments, he retained the RFC for work activities at all exertional levels, does not detract from the conclusion that due, in part, to his cognitive issues, Samuel was insufficiently advised of his right to counsel, such that his waiver was neither knowing or voluntary. As previously noted, Courts have remanded cases for failure to advise a claimant that the right to representation meant the right to counsel, even where no mental impairment exists. Here, Samuel's clear mental impairment should have alerted the ALJ that she needed to explain the concepts of representation, counsel, and waiver to Samuel in basic terms and ensure that he understood the implications of proceeding unrepresented. The ALJ's colloquy with Samuel on these issues fell short of that mark.

This documentation of mental impairment was confirmed by Samuel's testimony at the hearing, which, contrary to the Commissioner's characterization (Dkt. 21 at 4), revealed difficulty understanding concepts, inconsistencies, and gaps. Samuel expressed, for instance, that he had difficulty answering the questions posed to him by the ALJ. (Tr. 677 (Samuel stating that "[a]s you asking me now, you asking me so much questions that I can't even like really answer back to you").) Samuel also had difficulties understanding the concept of objecting to evidence,[10] and even stated that he did not understand what it meant to be "under oath." (Tr. 667.)[11]

---

[10] The following exchange took place when the ALJ asked if Samuel had objections to considering his file as evidence:

> ALJ: All right, sir. You had an opportunity to review your file and the evidence that's in it? Speak, sir.
> SAMUEL: Yes.
> ALJ: Do you have any objection to my considering this evidence when making my decision?
> SAMUEL: Yeah.
> ALJ: What is your objection? Is it okay for me —
> SAMUEL: I don't have no objection
> ALJ: —— to enter this into evidence and consider it when making my decision?
> SAMUEL: No.
> ALJ: It's not? So then what shall I base my decision on sir?
> SAMUEL: Well what I have to say.
> ALJ: So you object to this evidence?
> SAMUEL: Yeah.
> ALJ: What about it do you object to?
> SAMUEL: There's a couple of stuff in there that I object to
> ALJ: You have to speak up, sir, I can't hear you.
> SAMUEL: There's a couple of stuff that's in there that I object to.
> ALJ: What is that?
> SAMUEL: Some of them documents, or the doctor's appointments and all that stuff.
> ALJ: And what does it say that you object [to]? What is the problem?
> SAMUEL: The problem is because — yeah, I have a lot of stuff about me going to the doctors, which I don't have enough. I don't have, like——
> ALJ: Let's talk about what I do have, okay?
> SAMUEL: Mm—hmm.
> ALJ: The evidence I do have, do you have an objection to this evidence?

Notwithstanding Samuel's apparent and acknowledged limitations in understanding the proceedings or how to represent himself, there is no indication that the ALJ satisfactorily considered whether Samuel knowingly waived his right to representation during the hearing. The ALJ failed to tailor her explanations to Samuel's limited capacity and understanding. The Court thus finds that the ALJ did not adequately advise Samuel of his right to be represented by an attorney at the hearing, such that the Court can find that Samuel's waiver was knowing and voluntary. *See Collado*, 2009 WL 2778664, at *11 ("Although the administrative record contains some information concerning the [claimant's] . . . right to representation, [the claimant's] limited education, her alleged mental impairments, and her limited command of the English language, at a minimum, required the ALJ to perform more than a perfunctory inquiry" regarding whether the claimant wished to proceed without an attorney); *Leonard v. Comm'r of Soc. Sec.*, 05 CV 1084, 2008 WL 3285947, at *7−8 (N.D.N.Y. Aug. 7, 2008) (noting that the "question of a possible mental impairment," the claimant's stated "problems reading, writing" and limited schooling in special education classes, all favored a complete discussion of the waiver of the right to representation); *see also Bula v. Comm'r of Soc. Sec.*, 06 CV 1325, 2009 WL 890665, at *7−8 (N.D.N.Y. Mar. 30, 2009) (noting that fact that claimant did not speak

---

SAMUEL: No. Well, no.
ALJ: No?
SAMUEL: No.
ALJ: Okay. So it's okay for me to enter these documents into evidence−−
SAMUEL: Yeah.
ALJ: −−and consider it when making my decision?
SAMUEL: Yes.

(Tr. 665−667.)

[11] The DHO also noted that Samuel's vocabulary was limited and that he needed to have certain words explained to him before he could answer questions he was asked at the hearing. (Tr. 57; *see* Tr. 70 ("[t]he claimant was able to understand questions and give relevant answers as long as he was familiar with the vocabulary").)

English militated in favor of the ALJ discussing the claimant's right to representation in more complete detail in order to establish a valid waiver of such right).

The Commissioner's assertion that the ALJ fulfilled her duty to advise Samuel of his right to counsel because Samuel lived with his aunt and the notices were sent to her, and therefore it "can be assumed" that Samuel's aunt reviewed and explained the notices to Samuel, is troubling. (Dkt. 21 at 2.) As indicated above, ALJs have a duty *at the hearing* itself to properly inform claimants of their right to counsel. *Lamay*, 562 F.3d at 507. An ALJ cannot fulfill his or her statutory obligation on family members by *assuming* that a claimant's family or friends advised him or her of the right to a lawyer or other representation. Here, the fact that Samuel's notices were sent through his aunt, if anything, should have signaled to the ALJ that Samuel, who was just 21 and had been receiving SSI since he was 13, might not be capable of handling his own legal affairs, and that the aunt's testimony and assistance at the hearing might be valuable or even necessary. Indeed, Samuel informed the ALJ that his aunt had taken him to the hearing. (Tr. 679.)

Equally unavailing is the Commissioner's contention that Samuel's waiver was knowingly made because Samuel was previously involved in the criminal justice system and therefore understood what it meant to be represented by counsel. (Dkt. 21 at 3−4.) Again, any prior advice Samuel may have received is irrelevant to the *ALJ's* affirmative obligation at the hearing to advise Samuel of his right to counsel. The ALJ cannot assume that Samuel was adequately advised of his right to counsel in his criminal proceedings,[12] or that Samuel would thereby infer that he had the same right to an attorney in an altogether different setting.

---

[12] In fact, given that Samuel was a minor at the time of his criminal matter, he likely would have had a parent or guardian, like his aunt, present during his arrest processing or arraignment proceeding, when Samuel would have been advised of his right to counsel.

For all these reasons, the Court therefore concludes that the limited inquiry conducted by the ALJ into Samuel's decision to proceed unrepresented did not establish that Samuel knowingly waived his right to counsel.

**B.  The ALJ's Failure to Properly Advise Samuel Caused Him Prejudice**

Having concluded that the ALJ failed to properly apprise Samuel of his right to counsel, the Court must determine whether Samuel's lack of counsel resulted in prejudice justifying remand.  The Court finds that it did.

"[C]ourts have concluded that '[r]emand for lack of representation is proper only if the lack of counsel resulted in prejudice to the claimant or unfairness in the proceeding.'"  *Hynes*, 2013 WL 3244825, at *13 (quoting *Flores v. Astrue*, 08 CV 2810, 2009 WL 1562854, at *8 (S.D.N.Y. May 27, 2009)); *see also Robinson*, 733 F.2d at 258 ("[T]he failure of the ALJ to develop the record fully and to afford [claimant], who was unrepresented by counsel, an adequate opportunity to do so, denied [claimant] a fair hearing."); *Santana v. Apfel*, 44 F.Supp.2d 482, 484 (E.D.N.Y.1999) ("The absence of adequate notice of plaintiff's right to counsel clearly had a prejudicial effect on the fairness of the hearing.").

"Determining whether a claimant was prejudiced is bound up in the inquiry of whether the ALJ properly conducted the hearing and adequately developed the record in the manner the Second Circuit requires in a *pro se* case."  *Sheerinzada*, 4 F. Supp. 3d at 497 (quoting *Flores*, 2009 WL 1562854, at *8) (internal quotation marks omitted).  Since disability-benefits proceedings are non-adversarial in nature, it is well-established the ALJ has an affirmative obligation to develop a complete administrative record.  *See Lamay*, 562 F.3d at 508–09; *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004).  "Where . . . the claimant is proceeding pro se, the ALJ has a heightened duty to prevent prejudice to the claimant, and must scrupulously and

conscientiously probe into, inquire of, and explore for all the relevant facts surrounding the alleged right or privilege." *Flores*, 2009 WL 1562854, at *8 (internal marks and citation omitted). For *pro se* claimants, "reasonable efforts" to develop the record include "more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpoenas requiring the production of evidence, as authorized by 42 U.S.C. § 405(d), and advising the [claimant] of the importance of the evidence." *Jones v. Apfel*, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999). Thus, "[i]n the *pro se* context, prejudice is shown where the ALJ neglected to develop properly the administrative record in a manner consistent with the heightened *pro se* standard." *Judge v. Astrue*, 09 CV 4058, 2011 WL 1810468, at *3 (E.D.N.Y. May 10, 2011).

Significant to this action, "[t]he ALJ's duty to develop the record is further enhanced when the disability in question is a mental impairment. *Jackson v. Colvin*, 13 CV 5655, 2014 WL 4695080, at *16 (S.D.N.Y. Sept. 3, 2014).

Applying these principles to this case, the Court finds that Samuel has demonstrated that his lack of counsel at the hearing resulted in prejudice to him because the ALJ failed to meet her heightened duty to develop the record. The ALJ's task in this case was certainly difficult, since Samuel's responses to the ALJ's questions were often confused and unclear.[13] These difficulties

---

[13] As an example, the Court notes the following exchange regarding Samuel's ability to work:

> ALJ: Have you ever worked at all ever?
> SAMUEL: No.
> ALJ: Why not?
> SAMUEL: Never. Because I wasn't able to.
> ALJ: Why are you not able to?
> SAMUEL: I don't know how to.
> ALJ: I don't know what that means.
> SAMUEL: What I mean is I don't know how to. And what I mean by don't know

were no doubt compounded by the lack of counsel to assist Samuel in preparing for his testimony, helping him understand the ALJ's questions, and helping to fill in gaps or clarify Samuel's testimony through additional questioning. At a minimum, however, the ALJ should have called Samuel's aunt to assist in amplifying and clarifying Samuel's confused hearing testimony. Although the record contains her statements as to his abilities (*see* Tr. 194−95), at the hearing, Samuel made repeated references to his aunt and her ability to fill in gaps in his knowledge. (*See, e.g.*, Tr. 678 (Samuel stating that his aunt knew the name of his psychiatrist who prescribed his medication).) Samuel testified that he lived with his aunt and relied on her to help him with appointments, and to help him with activities such as taking public transportation. (Tr. 680, 685, 678 (Samuel stating that his aunt found his most recent psychiatrist because he "ha[d not] been the same person" during the two years that he did not receive consistent therapy).) Samuel also testified that he arrived at the hearing, and travels to see the mother of his children, with the help of his aunt. (Tr. 679, 685.)

Notably, the ALJ's decision discounted Samuel's testimony as "not fully credible" on the basis that he was a "very poor historian" and made inconsistent statements. (Tr. 29.) Yet the

---

how to, is I don't know what to do with work. I don't know how to go into work and I don't know how to do what I have to do to work.
ALJ: So you don't know how to walk into a store and say I want to apply for a job?
SAMUEL: No.
ALJ: And what is that ─ do you know why that is, do you know what your problem is?
SAMUEL: No.
ALJ: What your diagnosis is?
SAMUEL: I'm not ─ my mind is not right for anything right now.
ALJ: Has it ever been right?
SAMUEL: No. It haven't ever been right. I'm an ADHD kid.

(Tr. 674.)

ALJ did not attempt to find witnesses to testify on Samuel's behalf. Given Samuel's noted and apparent difficulties in verbal communication and the noted inconsistencies in his testimony, and the ALJ's reliance on these inconsistences in her decision, the failure to question his aunt was a failure to fully develop the record. *See Gold v. Sec'y of Health, Ed. & Welfare*, 463 F.2d 38, 43−44 (2d Cir. 1972) (finding that the ALJ's "failure to call witnesses or to indicate that she ought to do so because he considered her case unpersuasive . . . compounded [the claimant's] difficulties and provided her with less than a fair hearing"). Indeed, Social Security Ruling 11−2P, which is applicable to documenting and evaluating disability in young adults aged 18 to 25, instructs that ALJs consider "[e]vidence from other sources who are not medical sources, but who know and have contact with the young adult," such as "family members" or "educational personnel" to assist in "evaluat[ing] the severity and impact of a young adult's impairment(s)." Titles II & XVI: Documenting & Evaluating Disability in Young Adults, SSR 11−2P, 2011 WL 4055665, at *5 (Sept. 12, 2011); *see* 20 C.F.R. § 402.35 (Social Security Acquiescence Rulings "are binding on all components of the [SSA]"); *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (Social Security Rulings are binding on all SSA decision-makers).[14] The absence of counsel, under these circumstances, made matters even worse. *See Hynes*, 2013 WL 3244825, at *13 (finding that an attorney would have assisted the claimant by "highlighting" supporting medical evidence regarding the claimant's alleged depression, and by "possibly calling" witnesses to testify on the claimant's behalf).

---

[14] On remand, the ALJ should considering exploring with Samuel's aunt the nature of his probation program. At the hearing, Samuel testified that he had been attending a "program" associated with probation for the past three to four months, which helped him with his kids and "basically to guide [him] with life", but he could not remember the name of the program. (Tr. 671−72.)

Samuel was also prejudiced by the ALJ's failure to obtain records from St. Vincent's, where, according to Samuel's testimony, he had been receiving psychiatric treatment until around 2010 with a Ms. McGrady, and a doctor whose name he could not recall.[15] (Tr. 676−78.) Following the hearing, the ALJ requested records from Interfaith and Beth Israel, but there is no evidence that the ALJ made an attempt to obtain records from St. Vincent's. (*See* Tr. 29, 32−33.) Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well−supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in *Burgess*). "Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is 'all the more important.'" *Rocchio v. Astrue*, 08 CV 3796, 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010) (citation omitted), *report and recommendation adopted*, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011). Citing the absence of treating records from this period, the ALJ accorded "great weight" to the opinions of consultative examiners. (Tr. 28−30). Thus, the ALJ failed in her "duty to adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts [were] sufficiently developed and considered." *Cruz*, 912 F.2d at 11 (citation and internal marks omitted).

It also appears that the ALJ may have overlooked evidence from a school psychologist who counseled Samuel. The treating physician rule applies to all medical opinions obtained from treating sources, which, pursuant to applicable regulations, specifically encompasses school psychologists. 20 C.F.R. § 416.913(a). Here, an April 20, 2009 "Teacher Questionnaire"

---

[15] Again, the ALJ could, and should, have attempted to obtain information about Samuel's treatment at St. Vincent's from Samuel's aunt.

completed by a school psychologist when Samuel was in his tenth grade year indicates that Samuel was receiving twice−weekly counseling from the psychologist. (Tr. 369−76.) The psychologist, who stated that he had known Samuel for four years, rated Samuel as having "serious" and "very serious" functional limitations in the areas of "Acquiring and Using Information" and "Attending and Completing Tasks." (Tr. 369−71.) The ALJ's decision, however, omits any mention of this report, much less the weight he assigned to this opinion, if any. Instead, the ALJ relies in large part on the opinions of the agency's consultative examiners. (Tr. 28−29.) A hearing officer must always "give good reasons in [her] notice of determination or decision for the weight [she] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 416.927(c)(2); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand).[16]

Accordingly, the Court finds that the ALJ failed to adequately ensure that Samuel was aware of his right to be represented by an attorney and that Samuel knowingly and voluntarily waived that right. The Court also finds that Samuel's lack of counsel resulted in prejudice to him because an attorney would have assisted Samuel in ensuring that a complete and clear evidentiary record was established at the agency hearing and that the necessary medical and other health and social service records regarding Samuel's impairments were obtained and highlighted for the ALJ during the hearing. Therefore, remand is appropriate in this case and the

---

[16] The ALJ's discussion gave short shrift to Samuel's school records, limiting her discussion of those records to the fact that Samuel "ha[d] a history of ADHD and was in special education classes when he was in school." (Tr. 28.) On remand, the ALJ should consider these records in accordance with SSR 11−2P, which states that "[e]vidence from school programs, including secondary and post−secondary schools, can . . . help [the ALJ] evaluate the severity and impact of a young adult's impairment(s)." 2011 WL 4055665, at *5−6.

court need not address the parties' other arguments.[17] *See Sheerinzada*, 4 F. Supp. 3d at 498−99 (remanding on basis that ALJ failed to adequately advise of right to counsel and thereby prejudiced claimant, without addressing other arguments); *Robinson*, 733 F.2d at 257 ("As we agree with [the claimant's] second argument that he was not accorded a fair hearing, we find it unnecessary to consider his first and third arguments.").

## CONCLUSION

For the reasons set forth above, the Court DENIES the Commissioner's motion for judgment on the pleadings (Dkt. 17), and GRANTS Samuel's cross−motion (Dkt. 19). The Commissioner's decision is remanded for further consideration and new findings consistent with this Memorandum & Order. The Clerk of Court is respectfully requested to enter judgment accordingly.


SO ORDERED:


 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: September 30, 2015
          Brooklyn, New York

---

[17] Samuel also argues that the ALJ failed to obtain testimony from a vocational expert, that Samuel's RFC was not based on substantial evidence, and that the ALJ's credibility finding was flawed. (Dkt. 22 at 5−8.)